**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KBW INVESTMENT PROPERTIES, LLC | : | Case No. 20-cv-4852 |
| | : | |
| Plaintiff | : | Judge: James L. Graham |
| | : | |
| v. | : | |
| | : | **Motion for Temporary Restraining** |
| SECRETARY ALEX AZAR, et al. | : | **Order and Preliminary Injunction** |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Now comes Plaintiff, KBW Investments Properties, LLC (hereinafter referred to as "Plaintiff"), by and through its undersigned counsel of record, and hereby moves, pursuant to Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order and preliminary injunction pending trial in this matter against Defendants, Alex Azar, U.S. Department of Health and Human Services, Acting Chief of Staff Nina B. Witkofsky, and the U.S. Centers for Disease Control and Prevention (hereinafter collectively "CDC") vacating their September 1, 2020 Order suspending lawful residential evictions as applied to Cassandra King. Plaintiff also moves for a temporary restraining order and a preliminary injunction pending trial in this matter against Defendant, Franklin County, Ohio Municipal Court c/o Honorable Jarrod B. Skinner, Judge (hereinafter "FCMC") vacating their Order issued on September 14, 2020 staying the eviction against Cassandra King, and requiring an immediate evidentiary hearing.

In the alternative, Plaintiff respectfully requests this Court to issue an order enjoining all courts in this jurisdiction from staying pending evictions or otherwise delaying evictions unless the veracity of a tenant-defendant's CDC declaration is substantiated by the tenant-defendant and require an immediate evidentiary hearing giving the tenant-defendant the opportunity to do so.

Furthermore, Plaintiff requests that this Court issue an order that no federal certification under the CDC's regulation is valid and no Landlord can be held criminally culpable, unless a plaintiff has access to the courts to establish the veracity of the CDC certification during the pendency of an eviction action.

The property subject to this dispute is located at 2322 McGuffey Road, Columbus, Ohio 43211 (the "Subject Premises"). When KBW Investment Properties, LLC rented the Subject Premises to Cassandra King, they expected Ms. King to uphold her end of the contract and pay her rent. Plaintiff also expected that if Ms. King did not, they could resort to the court system to evict Ms. King, regain possession of their property, and re-rent the Subject Premises to another tenant with the ability to pay rent.

However, the CDC, a federal agency, issued a sweeping unilateral order suspending state law evictions under the flimsy premise that doing so was "necessary" to control the COVID-19 pandemic. CDC's actions are not authorized by statute or regulation. But even if they were, they are unprecedented in our history and an affront to core constitutional limits on federal power. If allowed, the order would abrogate the right to access the courts, violate limits on the Supremacy Clause, implicate the non-delegation doctrine, and run afoul of anti-commandeering principles. CDC's effort to seize control of state law on such an insupportable basis must be rejected.

Accordingly, this Court should issue a TRO and a preliminary injunction as against Alex Azar, U.S. Department of Health and Human Services, Acting Chief of Staff Nina B. Witkofsky, and the CDC vacating their September 1, 2020 Order suspending lawful residential evictions as applied to Ms. King. Plaintiff also moves for a temporary restraining order and a preliminary injunction pending trial in this matter against FCMC vacating the Order issued on September 14, 2020 staying the eviction against Cassandra King, and requiring an immediate evidentiary hearing.

In the alternative, Plaintiff respectfully requests this Court to issue an order enjoining all courts in this jurisdiction from staying pending evictions or otherwise delaying evictions unless the veracity of the CDC declaration is substantiated by the tenant-defendant and require an immediate evidentiary hearing giving the tenant-defendant the opportunity to do so. Furthermore, Plaintiff requests that this Court issue an order that no federal certification under the CDC is valid unless a Plaintiff has access to the courts to establish the veracity of the CDC certification during the pendency of an eviction action.

## **MEMORANDUM IN SUPPORT**

### I.     FACTS

Plaintiff is the owner of the Subject Premises and rents said property to Cassandra King pursuant to a lease agreement. Ms. King moved into the Subject Premises on February 1, 2020. Under the terms of the lease, Ms. King is required to pay monthly rent in the amount of $795.00. Ms. King is also required to pay for utilities.

The Community Shelter Board located in Franklin County, Ohio paid her first months' rent and deposit. On March 11, 2020, a partial payment of $360.00 was made for the month of March. Ms. King has failed to pay the remaining rent for the month of March and has failed to pay rent for the months of April, May, June, July, August and September of 2020. Ms. King has also failed to pay for utilities at the Subject Premises. Her outstanding balance is $6,037.93.

On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, P.L. 116-316 (hereinafter the "CARES Act"). Section 4024 of the CARES Act includes a limited and temporary moratorium on eviction for certain types of federally backed housing. The CARES Act expired on July 24, 2020.

On or about August 13, 2020, after serving a statutory eviction notice pursuant to Ohio Revised Code § 1923.04, Plaintiff caused an eviction action to be filed in the Franklin County, Ohio Municipal Court, case number 2020 CVG 19567 (hereinafter "the Action"). On or about September 4, 2020 the CDC published a regulation in the Code of Federal Regulation, 80 FR 55292, purportedly attempting to halt all residential evictions in the United States upon presentation by a tenant to a landlord of a Certification created by the CDC certifying that the tenant has done the following:

    (1) used best efforts to obtain all government assistance for rent or housing;

    (2) either (i) expects to earn no more than $99,000 in annual income for Calendar Year 2020, (ii) were not required to report any income in 2019 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment under the CARES Act;

    (3) are unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses;

    (4) they are using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses; and

    (5) eviction would likely render the individual homeless—or force the individual to move into a live in close quarter in a new congregate or shared living setting—because the individual has no other available housing.

The CDC regulation claimed to have been issued pursuant to Section 361 of the Public Health Services Act, 42 U.S.C. § 264 and 42 C.F.R. § 70.2, which states he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection. This statute does not provide any legal authority to allow the CDC to halt evictions and there has been no significant evidence presented that supports a causal connection between evictions and the spread of COVID-19.

On or about September 8, 2020 Plaintiff's members met Ms. King in the Columbus Convention Center to attend the eviction hearing scheduled for that date. On or about September 8, 2020, Plaintiff's members offered to allow Ms. King to remain in the Subject Premises if she would apply for rental assistance with IMPACT, a community organization that has been allocated approximately 6 million dollars in CARES Act funds to appropriate to tenants who cannot pay their rent in Franklin County, Ohio.

IMPACT maintains an office at eviction court in Franklin County, Ohio currently located in the Columbus Convention Center. Upon knowledge and belief, IMPACT has generally approved payment of all past due rent, fees, and costs associated with a default of a residential lease in order to avoid an eviction.

Ms. King elected not to enter into a repayment plan with Plaintiff and Ms. King did not apply for IMPACT funds. Instead, Ms. King entered into an Agreed Entry to move from the Subject Premises. A copy of the agreed court order wherein Ms. King agreed to move from the Subject Premises is attached hereto and labeled Exhibit "A". Ms. King was supposed on move from the Subject Premises or be subject to an eviction and immediate set out on or before September 10, 2020.

On September 10, 2020, Ms. King filed a Motion to Stay Set Out with the Franklin County Municipal Court, attached hereto as Exhibit "B", and Ms. King filed a Declaration for CDC Temporary Halt in Evictions, attached hereto as Exhibit "C". On or about September 14, 2020, without any notice, hearing or opportunity to respond to Ms. King's Motion to Stay the Set Out, Judge Jarrod B. Skinner of the Franklin County Municipal Court issued an Order staying the Set Out until apparently after the CDC regulation ceases to be in effect or December 31, 2020.

The Municipal Court's Order, attached hereto as Exhibit "D", requests that a Court of higher jurisdiction issue an opinion on the enforceability of the CDC regulation. The Municipal Court wholly failed to evaluate the veracity of the CDC certification issued by Ms. King to the Court. Plaintiff never even received a copy of the CDC certification, it went directly to the Court. Accordingly, the Municipal Court denied Plaintiff access to the Court.

Because of the CDC Order, Plaintiff suffers significant economic damages, including $6,037.93 in unpaid rent and utilities and the lost opportunity to rent or use the Subject Premises at fair market value $795.00 per month. Ms. King is insolvent and will not able to make Plaintiff whole once the CDC order expires at the end of December. Furthermore, Plaintiff has reached out to several aid organizations on Ms. King's behalf to help her pay her outstanding balance, but Ms. King has not made any effort, whatsoever, to assist in this process. Plaintiff's only opportunity to mitigate its loss is to regain possession of its property, which is being held unlawfully by Ms. King, and re-renting that property to another tenant.

## II.    LAW AND ARGUMENT.

### A.  Jurisdiction.

"A plaintiff can bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 149, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014). "When a statute creates substantial economic burdens and compliance is coerced by the threat of enforcement, it is not necessary to determine whether a plaintiff subject to the regulation has sufficiently alleged an intention to refuse to comply; it is sufficient for the plaintiff to demonstrate the statute's direct and immediate impact on his business and to establish that compliance with the regulation imposed will cause

significant economic harm." *NRA of Am. v. Magaw*, 132 F.3d 272, 276 (6th Cir.1997). "It is not necessary to try to determine the imminence of a threatened prosecution; it is necessary, instead, to determine if the statute can realistically be expected to be enforced against a plaintiff singled out for regulation because the government has made it clear that immediate compliance is mandatory." *Id*.

The Administrative Procedure Act (hereinafter "APA") entitles a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action…to judicial review thereof." 5 U.S.C. § 702. The APA requires courts to set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 702 (2)(B). It also requires courts to set aside action that is in excess of statutory jurisdiction. Accordingly, the APA entitles Plaintiff to judicial review of the CDC's regulation.

Plaintiff also submits this Court has inherent jurisdiction over Plaintiff's claims as a matter of equity because the Supreme Court has held "that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 326, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015); *see also Corr. Servs. Corp. v Malesko,* 534 U.S. 61, 74 ("injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). In *Armstrong,* the Court held "the ability to sue to enjoin unconstitutional action by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong,* 135 S. Ct. at 1384.

Fed.R.Civ.P. 65(a) allows a court to issue a preliminary injunction after notice has been provided to an adverse party. A court can also enter a temporary restraining order "without notice…to the adverse party" under Fed.R.Civ.P. 65(b). "The standard for granting a preliminary

injunction is similar to the standard for granting a TRO." *Planet Aid v. City of St. Johns, Michigan*, 782 F.3d 318, 323 (6th Cit. 2015).

### B.  Plaintiff is Entitled to Injunctive Relief.

In determining whether to grant injunctive relief, "the Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). *Id.* These four considerations are factors to be balanced, not prerequisites that must be met. *Id.*

#### 1.  Plaintiff Has a Likelihood of Success on the Merits

##### a.  The CDC Order is Without a Statutory or Regulatory Basis

"Although separation of powers 'd[oes] not mean that these [three] departments ought to have no partial agency in, or no controul over the acts of each other,' *Mistretta v. United States*, 488 U.S. 361, 380-381, 102 L. Ed. 2d 714, 109 S. Ct. 647 (1989) (quoting The Federalist No. 47, supra, at 325-326(emphasis deleted)), it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996).

"It is well settled that when an agency is acting pursuant to a statute, that agency has no power to act unless and until Congress confers power upon it." *United States v. Miami Univ.*, 91 F.Supp.2d 1132, 1134 (S.D.Ohio 2000). The CDC's order is purportedly authorized by 42 U.S.C § 264 and 42 C.F.R. § 70.2, but neither provision grants the agency the broad authority to unilaterally void state laws across the country. 42 U.S.C § 264 says that the

Surgeon General may "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from…one State or possession into any other State or possession." 42 C.F.R. § 70.2 states the Director of the CDC "may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection."

Neither 42 U.S.C § 264 nor 42 C.F.R. § 70.2 provide any legal authority to allow the CDC to halt evictions nationwide. At most, these provisions allow limited orders related to certain disease control measures, which is not justification for a wholly unrelated moratorium on eviction proceedings. This is especially true considering there has been no significant evidence presented that supports a causal connection between evictions and the spread of COVID-19.

Traditional canons of construction such as *ejusdem generis, expression unius, noscitur asociis, casus omissus,* and non-surplusage show that CDC lacks the authority it needs to hold out its order as the supreme law of the land. *See* Antonin Scalia and Bryan Garner, *Reading Law: The Interpretation of Legal Texts,* 199-213, 107-111, 195-198, 93-100, 174-179 (Thompson/West 2012). These canons of construction show any link between relevant federal statutes and the CDC's eviction regulation is so weak and attenuated that the CDC cannot lawfully deprive Plaintiff of its constitutionally protected right to the state-court eviction process.

Both the statute and regulation speak in terms of "inspection, fumigation, disinfection, sanitation, pest extermination, or destruction of animals or articles," 42 U.S.C. § 264(a) and 42 U.S.C. § 70.2, which are wholly unrelated to eviction procedures under state law. The *ejusdem generis* canon suggests that both provisions must be limited to actions taken in keeping with these examples. *Ejusdem generis,* therefore, looks to the genus to which the initial terms belong—

controlling communicable diseases through inspection and destruction of animal and articles—and presumes that the drafter has that genus or category in mind for the entire passage; the tagalong general term cannot render the prior enumeration superfluous. *See, e.g.*, *Circuit City Stores v. Adams*, 532 U.S. 105, 109, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) ("contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" held to include only transportation workers in foreign or interstate commerce); *McBoyle v. United States*, 283 U.S. 25, 26, 51 S.Ct. 340, 75 L.Ed. 816 (1931) ("automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails" held not to apply to an airplane). Abrogating state eviction laws bears no relationship to the statutory phrasing and thus would read the term "other measures as… may be necessary" far beyong any rational reading. *See* 42. U.S.C. § 264(a).

*Expressio unius,* or the negative-implication cannon, supports this reading. This canon has greater force the more specific the enumeration. Scalia and Garner at 108. Here, the enumeration given in 42 U.S.C. § 264(a) is so specific to the types of ways to stop the "spread of communicable diseases" that the more general phrase ("and other measures, as in his judgment may be necessary") cannot go much beyond the scope of the narrow specifics that precede it. Nor can the regulation's reference to "reasonably necessary" measures extend that far. Evictions, property law, landlord-tenant law, and law relating to non-impairment of contracts are well beyond the genus of the enumeration and, therefore, the CDC has no power to issue the eviction moratorium challenged here.

The next canon, *noscitur a sociis,* or the associated words canon, also instructs that words in a list are associated in a context suggestion that the words have something in common so that they should have a similar meaning. Scalia and Garner at 195; *Yates v. United States,* 574 U.S.

528, 544 (2015) ("'Tangible Object' is the last in a list of terms that begins 'any record or document.' The term is therefore appropriately read to refer not to any tangible object, but specifically to the subject of tangible objects involving records and documents, *i.e.*, objects used to record or preserve information."). Here, "any other measures" is appropriately read to refer not to *any* measures such as eviction moratoriums but only to a subset of measures that are similar to the measures enumerated, such as "inspection, fumigation, disinfection," etcetera. *See* 42 U.S.C. § 264(a). And "reasonably necessary" measures must also be the same in kind. *See* 42 C.F.R. § 70.2.

*Casus omissus,* or the omitted-case canon, instructs the courts to be careful in not supplying "judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554 (1925). Indeed, "to supply omissions transcends the judicial function." *Iselin v. United States,* 270 U.S. 245, 251 (1926). Neither the operative statute nor the regulation says anything about abrogating state property law, and it would inappropriate for this Court to supply that which Congress left out of 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2. To read these provisions so broadly would be an astonishing expansion of what Congress clearly meant to allow.

The non-surplusage canon also holds that "no provision should be construed to be entirely redundant." *Kungys v. United States,* 485 U.S. 759, 778 (1988) (Scalia, J., plurality opinion). Construing 42 U.S.C. § 264(a) or 42 C.F.R. § 70.2 as authorizing the CDC to superintend the entire United States economy and population would render as mere surplusage almost the entire United State Code. In understated terms, broadly construing the phrase "other measures" to cover eviction moratoriums would make the preceding enumeration mere surplusage.

Finally, reading either provision to allow for the CDC to create a substantive criminal law for violating a federal eviction mortarium would violate the constitutionally-required rule of lenity.

*See Yates v. United States,* 135 S.Ct. 1074, 1088 (2015); *United States v. Galaviz*, 645 F.3d 347, 361-362 (6th Cir.2011). Lenity is a rule of statutory construction that "tells courts to interpret ambiguous criminal laws in favor of criminal defendants. *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 729 (6th Cir.2013).

Two constitutional principles underlie lenity: due process and the separation of powers. The rule protects individuals' rights "by requiring fair warning of what the law intends to do if a certain line is passed." *Id.* at 717 (cleaned up). Lenity "protects the balance of power among the three branches of government by reserving to the legislature the task of determining what conduct to prohibit and what punishment to impose." *Id.*; *see U.S. v. Bass*, 404 U.S. 336, 348 (1971). Stated another way, lenity "promotes separation of powers by reserving to Congress the power to 'define a crime, and ordain its punishment.'" *Wright*, 607 F.3d at 719 (Pryor, J., concurring) (citation omitted). By construing ambiguous criminal statutes in favor of the accused, the "judicial branch refrains from expansively interpreting criminal statutes so as to prohibit more conduct or punish more severely than Congress intended." *Id.* at 717 (citing *Ladner v. United States*, 358 U.S. 169, 177- 78 (1958)). "[C]riminal laws are for courts, not for the Government, to construe." *Abramski v. U.S.*, 573 U.S. 169, 191 (2014).

If this Court were to disregard the restrictive phrasing "inspection, fumigation, disinfection," etc., to allow the eviction moratorium, it would allow CDC to consolidate both legislative and executive functions in a single branch and create new criminal law where none existed before. Indeed, CDC is explicit that those who violate its order face criminal consequences, including up to a year in prison. 85 Fed. Reg. at 55296. But processing evictions under state law is undoubtedly lawful in the exercise of legislative judgment under state law. And it is certainly not *criminal* in the eyes of Congress. Vesting the unilateral authority to say otherwise and imprison

citizens for *following state law* based on the thinnest reed of being "necessary" for disease control would violate the fundamental rule of lenity. *See Wright*, 607 F.3d at 719 (Pryor, J., concurring). This Court should not sanction such outrageous conduct by a federal agency.

Even if the provisions *could* be read so broadly as to allow the order, CDC's actions fail the textual limit of being "reasonably necessary." Section 70.2 requires CDC to first determine that "measures taken by health authorities of any State ... are insufficient to prevent the spread of any of the communicable diseases from such State." But CDC's findings here are woefully inadequate. CDC relies on the outlandish leap in imagination that because "mass evictions" and "homelessness" might increase the likelihood of COVID-19 infection then allowing any number of evictions in any state is insufficient to prevent the spread of the disease. *See* 85 Fed. Reg. at 55294-96. Such catastrophizing hardly follows basic logic. Why should a single eviction following ordinary process necessarily result in "mass evictions," much less mass homelessness? And why should courts assume that newly evicted individuals will not find less expensive (or perhaps fully subsidized) housing? CDC has not established a factual basis for its assumption that newly homeless individuals might mingle with others in a way more dangerous to public health than dining in restaurants or attending church services. Indeed, CDC's order seems to refute this notion as it does not apply to "foreclosures on a home mortgage," even though such evictions would seem to implicate homelessness to the same degree as residential lessees. *Id*. at 55293. CDC acts as though states that allow in-person dining, indoor worship, and even in-person bar service are acting perfectly reasonably but using ordinary property laws to allow isolated evictions are "insufficient."

CDC also fails to show that the eviction order is "reasonably necessary" to prevent the spread of disease. Even if one accepts the premise that mass homelessness could create an uptick in COVID-19 infections, why is an eviction moratorium "necessary" to stop it? There is no

evidence that allowing normal processes to play out would cause "mass evictions," much less catastrophic homelessness. And there is even less evidence that suspending all evictions nationwide is "necessary" to stop this imagined wave of mass homelessness. And there is no reason to think that the eviction order is any more "necessary" than other disease control measures. There are simply too many leaps in logic and evidence to be able to support such an overwhelming show of federal authority. CDC has made little serious effort to show the *necessity* of its eviction ban.

In short, CDC's order cannot be justified by its statutory and regulatory source. Plaintiff is likely to succeed on his claim that it is an invalid agency action.

### b. The CDC's order violates Plaintiff's right to access the court; FCMC has violated Plaintiff's right to access the court.

"The Constitution promises individuals the right to seek legal redress for wrongs reasonably based in law and fact." *Harer v. Casey*, 962 F.3d 299, 306 (7th Cir. 2020); see also *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) ("However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."). As the Supreme Court recognized more than 100 years ago:

> The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by each state to the citizens of all other states to the precise extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the states, but is granted and protected by the Federal Constitution.

*Chambers v. Baltimore & Ohio Railroad*, 207 U.S. 142, 148 (1907).

The right is grounded in Article IV's Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth and Fourteenth Amendment Due Process Clauses and the

Fourteenth Amendment's Equal Protection Clause. *Christopher*, 536 U.S. at 415 n. 12. Regardless of the specific source, citizens have a fundamental right of "access to the courts." *Hudson v. Palmer*, 468 U.S. 517, 523 (1984); accord Christopher, 536 at 414.

Most typically, claims of denial of access to the courts involve "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Christopher*, 536 U.S. at 413. Such a claim "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id*. at 415.

When a government official erects barriers that constitute a "complete foreclosure of relief" for a valid underlying action, a plaintiff's right to access the courts has been denied. *Harer*, 962 F.3d at 311-12. As the Fourth Circuit said nearly 50 years ago, "Of what avail is it to the individual to arm him with a panoply of constitutional rights if, when he seeks to vindicate them, the courtroom door can be hermetically sealed against him by a functionary who, by refusal or neglect, impedes the filing of his papers?" *McCray v. State of Md*., 456 F.2d 1, 6 (4th Cir. 1972).

Perhaps the most famous case involving the right to access is also the most applicable here. In *Boddie v. Connecticut*, 401 U.S. 371, 372, 374, 380 (1971), the Supreme Court invalidated a state law requiring prepayment of filing fees for divorce proceedings because it foreclosed the "sole means ... for obtaining a divorce" for indigent litigants. "[G]iven the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the means for legally dissolving [the marriage] relationship" "due process does prohibit a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." *Id*. at 374; *see also Christopher*, 536 U.S. at 413 (citing *Boddie* as an access to the courts case).

The *Boddie* decision has been applied to ensure that classes of litigants are not locked out of the courthouse. Thus, a law requiring a litigant to post a bond before being able to access a trial in a court of record was invalid, because it was "the only effective means of resolving the dispute at hand." *Lecates v. Justice of Peace Court No. 4 of State of Del.*, 637 F.2d 898, 908 (3d Cir. 1980) (citation omitted). So too was a public school barred from requiring a tenured teacher to pay for the costs of a disciplinary proceeding, as there was no way for a teacher to "exercise" his rights "other than in a manner penalizing those seeking to assert it." *Rankin v. Indep. Sch. Dist. No. I-3, Noble Cty., Okl.*, 876 F.2d 838, 841 (10th Cir. 1989).

Moreover, courts have recognized that the constitutional guarantee does not rely "solely on the fundamental nature of the marriage relationship" but instead turns on whether "(1) resort to the courts is the sole path of relief, and (2) governmental control over the process for defining rights and obligations is exclusive." *Lecates*, 637 F.2d at 908-09. Indeed, even a limited property interest in continuing employment as a teacher was of equal weight as the interest in obtaining a divorce in *Boddie*. *Rankin*, 876 F.2d at 841.

Here, the CDC order has unlawfully stripped Plaintiff of its constitutional right to access the courts. As a threshold, Plaintiff has an undisputed right to a writ of eviction but has been barred totally by the order. Plaintiff has a valid lease agreement and has provided habitable premises to his tenant. Yet the tenant has refused to pay rent, now owing Plaintiff almost eight times the monthly rent—a total of $6,037.93. Were the courts open to it, Plaintiff would be fully entitled to avail itself of the statutorily mandated process to evict its tenant so that it could either use its property or attempt to rent it to another person at a fair market rent of at least $795.00 per month. Plaintiff has therefore met the initial requirement of showing the merit of his underlying claim. *See Christopher*, 536 U.S. at 413.

Moreover, the order constitutes a "complete foreclosure of relief" because it denies Plaintiff the *only* lawful means of regaining possession of his property. Ohio landlord-tenant law is governed by Chapters 1923 and 5321 of the Ohio Revised Code. In Ohio, when a tenant owes unpaid rent, a landlord's only lawful means of regaining possession is to initiate a forcible entry and detainer action ("FED") under Chapter 1923 of the Ohio Revised Code. To re-acquire possession, the landlord must first serve a notice to leave the premises in accordance with R.C. 1923.04. A complaint is then filed in accordance with R.C. 1923.05. A hearing is held and once a landlord obtains a judgment for restitution in its favor, "the court shall issue a writ of execution on the judgment." R.C. 1923.13.

A FED action is a landlord's *sole* means of reacquiring possession of his residential property. A sheriff, police officer, constable, or a bailiff shall enforce a writ of eviction. R.C. 1923.14. R.C. 5321.15 prohibits self-help remedies by a landlord and states: "no landlord of residential premises shall initiate any act, including termination of utilities or services, exclusion from the premises, or threat of any unlawful act, against a tenant, or a tenant whose right to possession has terminated, for the purpose of recovering possession of residential premises, other than as provided in Chapters 1923., 5303., and 5321. of the Revised Code." *See* also *State v. Dennis*, 182 Ohio App.3d 674, 2009-Ohio-2173, 914 N.E.2d 1071, ¶ 33 (2d Dist.) (holding that a landlord is required to successfully bring a forcible entry and detainer action against a tenant in order to effectuate an eviction, and without a judgment of restitution in the landlord's favor, the tenant could continue to lawfully possess the premises).

R.C. 5321.15(C) states a landlord who violates this section is liable in a civil action for all damages caused to a tenant, or to a tenant whose right to possession has terminated, together with

reasonable attorney's fees. Thus, "self-help" evictions are unlawful in Ohio and can result in a landlord being liable to a tenant for damages and attorney's fees.

The CDC Order has deprived Plaintiff of its only path for recovery of its property. The "only effective means of resolving the dispute at hand" has been closed, and thus Plaintiff's right to access the courts has been violated. *See Boddie*, 401 U.S. at 376. Just as with laws limiting divorce actions and even use of courts of record, the "governmental control over the process for defining rights and obligations" for evictions in Ohio "is exclusive" and therefore Plaintiff's rights have been violated. *See Lecates*, 637 F.2d at 908-09. Accordingly, the CDC and FCMC acting on the CDC's Order, have deprived Plaintiff of its only path for recovery of its property.

### c. The CDC's Order Does Not Validly Preempt State Law.

Plaintiff is also likely to succeed on the merits because the CDC order does not validly preempt state law. There is nothing in the relevant statutes and regulations, 42 U.S.C. § 264 and 42 C.F.R. § 70.2, that purports to give CDC the authority to issue a nationwide eviction-moratorium order that preempts state law. There is also nothing in the relevant statutes or regulations that purports to give CDC the authority to supersede the Contracts Clause of Article I, Section 10 of the United States Constitution, and preempt the Contracts Clause of the Ohio Constitution (Oh. Const. Art. II, § 28), or states' laws protecting from impairment the obligations of private contracts that are in force.

CDC ordered a nationwide moratorium "to temporarily halt residential evictions to prevent the further spread of COVID-19." 85 Fed. Reg. at 55292. Yet, CDC's authority, as previously explained—and as this Court is required to construe using all available traditional tools of interpretation—is confined and narrow. To be sure, "state laws can be pre-empted by federal regulations as well as by federal statutes." *Hillsborough County, Fla. v. Automated Medical Lab,*

*Inc*., 471 U.S. 707, 713 (1985). The preemption analysis is therefore the same whether the court is evaluating the preemptive force of a federal statute or a federal regulation. CDC's order cannot be construed to preempt state law here.

*Midatlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986), is instructive. New Jersey law prohibited the abandonment of property of the estate on which toxic wastes had been dumped unless the site had been completely decontaminated. The federal bankruptcy law expressly allowed the trustee in a bankruptcy to "abandon any property that is burdensome to the estate or that is of inconsequential value to the estate." *Midatlantic*, 474 U.S. at 509 (quoting 11 U.S.C. § 554(a)). These provisions might appear to be in conflict: federal law allowed abandonment of the property while state law prohibited it.

The Supreme Court found that there was no preemption of the state law. The Court concluded that "Congress did not intend for the Bankruptcy Code to preempt all state laws that otherwise constrain the exercise of a trustee's power." *Id*. at 505. The Court also looked to federal environmental laws and said that they evidence a congressional "goal of protecting the environment against toxic pollution." *Id*. In other words, even in the face of a clear conflict between federal and state law, the Court rejected a preemption claim.

The CDC order on its face imposes an eviction moratorium, while there is no current Ohio eviction moratorium in place. It is difficult to see how Congress could have intended 42 U.S.C. § 264 to preempt state property and landlord-tenant law. Further, like *Midatlantic*'s review of federal environmental law to decide the preemption question, here, Article I, Section 10 of the Constitution evidences a strong federal policy that States should not impair the obligation of contracts, and landlord-tenant law has traditionally been within the "virtually exclusive province" of the states under the Tenth Amendment. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975); *see also Murphy v. NCAA*,

138 S. Ct. 1461, 1476 (2018) (stating that the Tenth Amendment reserves all legislative power to the States; whereas Congress has "not plenary legislative power but only certain enumerated powers"). It cannot be said, therefore, that a current Ohio policy that prevents impairment of contractual obligations is preempted by Section 264 or the CDC Order.

The savings clause of 42 U.S.C. § 264(e) underscores Plaintiff's argument against preemption. Congress has directed that Section 264 should *not* be construed "as superseding any provision under State law…, except to the extent that such a provision conflicts with an exercise of Federal authority under this section." Another obstacle in CDC's path to claiming preemption is the well-recognized "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough County*, 471 U.S. at 715. In other words, CDC is statutorily expressly *deauthorized* from issuing orders such as the eviction-moratorium order that would supersede state law.

Moreover, the relevant state laws do not conflict with CDC's authority to regulate "inspection, fumigation, disinfection, sanitation, pest extermination" and such other germicidal or decontamination actions. 42 U.S.C. § 264(a). To the contrary, CDC's order displaces inherent state authority over residential evictions in defiance of the Tenth Amendment's textual reservation of that body of law virtually exclusively to the states. The Supremacy Clause "is not an independent grant of legislative power to Congress"; instead "it simply provides a rule of decision." *Murphy*, 138 S. Ct. at 1479.

For CDC to show that its order validly conflict-preempts (*see also* 42 U.S.C. § 264(e)) state law, it must satisfy two requirements. First, the CDC order "must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do." *Murphy*, 138 S. Ct. at 1479. Second, "since the Constitution confers upon Congress the power to

regulate individuals, not States," CDC must show that its order is "best read as one that regulates private actors." *Id*. CDC's order points *only* to 42 U.S.C. § 264 and 42 C.F.R. § 70.2 to show it meets the first *Murphy* prong. Ordinary statutory construction, as explained above, reveals that these two provisions cannot carry the burden of showing CDC has invoked some power conferred on Congress by the Constitution other than the Supremacy Clause. As to the second factor, CDC is regulating state actors as much as, if not more than, private individuals. To be sure, the CDC order dangles the prospect of exorbitant fines and long periods of incarceration over landlords that seek evictions. But more importantly, CDC compels, controls, and deputizes local sheriffs and state courts to do CDC's bidding. In *Murphy*, as here, therefore, "there is no way in which [the CDC order] can be understood as a regulation of private actors." 138 S. Ct. at 1481. Plaintiff is, thus, likely to succeed on the merits of its non-preemption argument.

### 2. Plaintiff Will Suffer Irreparable Harm Absent a TRO

To satisfy the irreparable harm requirement, Plaintiff need only demonstrate that absent a preliminary injunction, he is "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. NRDC*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001); *see also Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("The district court properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights."); *Davis v. D.C.*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("A

prospective violation of a constitutional right constitutes irreparable injury."); *Northeastern Fla. Chapter of the Assoc. of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ( citing cases and saying, "The rationale behind these decisions was that chilled free speech and invasions of privacy, because of their intangible nature, could not be compensated by monetary damages; in other words, plaintiffs could not be made whole"). This is because the constitutional injuries cannot be made whole. *See Kikumura*, 242 F.3d at 963.

Constitutional harm aside, monetary harms can be irreparable when there is no adequate remedy available. *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005). Often, "[t]hese injuries are in the form of lost opportunities, which are difficult, if not impossible, to quantify." *Id*.; *see also Ferrero v. Assoc. Materials, Inc*., 923 F.2d 1441, 1449 (11th Cir.1991) ("loss of customers and goodwill is an 'irreparable' injury"). Harm is also irreparable when "damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp*., 17 F.3d 691, 694 (4th Cir. 1994) (quoting *Roland Mach. Co. v. Dresser Indus., Inc*., 749 F.2d 380, 386 (7th Cir. 1984) and collecting cases).

Plaintiff has suffered and will continue to suffer from irreparable harm in two forms: (1) violation of its constitutional rights; and (2) noncompensable loss of the value of its property. As discussed, the CDC order is unconstitutional, and thus Plaintiff need not show any harm beyond that fundamental violation of its rights. *See Assoc. of Gen. Contractors*, 896 F.2d at 1285.

Moreover, Plaintiff is unlikely to recover any of the economic damages it continues to incur because Ms. King is insolvent and will not have enough funds to make Plaintiff whole. There is currently an outstanding balance of is $6,037.93 and from the inception of the lease agreement, Plaintiff has only received one payment of $360 from an unknown source. Not to mention the costs

Plaintiff has incurred from maintaining the of the property, or of the lost revenue it could generate were it able to place the property on the market.

Furthermore, Plaintiff has secured an organization to remodel the Subject Premises unlawfully detained by Ms. King and cannot do so while she continues to reside there. Ms. King is insolvent, which is why eviction is such an essential remedy. Indeed, the CDC order expressly applies only to *insolvent* tenants, who are "unable to pay the full rent." 85 Fed. Reg. at 55293. Eviction is the only remedy that could allow Plaintiff to place its property on the market and seek rent from a solvent lessee, and it is the only one that would relieve Plaintiff of his unilateral obligation to maintain the property for a tenant in breach. A TRO is necessary to secure Plaintiff's opportunity to recover the value of its property as to both the "insolvent" tenant and the "loss of valuable business opportunities" that the order has denied it. *See MacGinnitie*, 420 F.3d at 1242; *Hughes Network Sys*., *Inc*., 17 F.3d at 694.

### 3. CDC Is Unconstitutionally Commandeering State Resources and State Officers to Achieve its Policy Objectives or Execute Federal Laws

The anticommandeering doctrine "is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e*., the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 138 S. Ct. at 1475. The Supreme Court has "always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." Id. at 1477. Congress "[can]not conscript state governments as its agents." Id.

The federal government also cannot "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).

Yet such commandeering is precisely what the CDC order does. It commandeers state courts and state officers (like sheriffs) to execute federal laws, namely, the CDC eviction-moratorium order. In other words, CDC cannot order state court judges and other relevant state actors to not process summary evictions. Neither Congress nor CDC can "compel the States to ... administer a federal regulatory program." *New York v. United States*, 504 U.S. 144, 188 (1992). It follows, therefore, that neither Congress nor CDC can "halt" pending or forthcoming state adjudicatory proceedings. Neither Congress nor CDC can modify state judicial processes by dictating that a declaration executed by a tenant shall be adequate proof or otherwise suffice to halt or suspend the judicial eviction action.

Put differently, while the Supreme Court can review state-court decisions (*Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304 (1816)) and reverse or uphold state-court evictions, Congress or CDC cannot step in to provide a rule of decision and deputize state courts and state officers to apply it, nor can Congress or CDC strip state courts of jurisdiction to process eviction cases—not without violating the anti-commandeering doctrine.

### 4. The CDC Order Is an Invalid Exercise of Legislative Power in Violation of Article I, § 1 of the U.S. Constitution

Plaintiff is also likely to succeed on his claim that the Order is invalid because it is the product of an unconstitutional delegation of legislative power to CDC. If, as the order contends, § 264 grants CDC virtually unbounded authority to re-write state property law, then it violates Article I, § 1 of the Constitution—which prohibits Congress from delegating away its legislative power.

Article I, § 1 states, "All legislative Powers herein granted shall be vested in a Congress of the United States." (Emphasis added.) The grant of "[a]ll legislative Powers" to Congress means

that Congress may not divest (or transfer to others) "powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1925). The nondelegation doctrine "holds that 'Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is [constitutionally] vested.'" *United States v. Ambert*, 561 F.3d 1202, 1213 (11th Cir. 2009) (quoting *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421 (1935)). The Supreme Court has repeatedly stressed the importance of this Article I Vesting Clause in maintaining the proper separation of powers among the three branches of government. *See Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892) (the doctrine that Congress may not delegate its legislative powers to the President or anyone else "is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution."); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928) ("in carrying out that constitutional division into three branches it is a breach of the fundamental law if Congress gives up its legislative power and transfers it to the President"); *Gundy v. United States*, 139 S. Ct. 2116, 2023 (2019) (plurality); *id*. at 2133 (Gorsuch, J., dissenting) ("The framers understood, too, that it would frustrate the system of government ordained by the Constitution if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals. Through the Constitution, after all, the people had vested the power to prescribe rules limiting their liberties in Congress alone.") (citation omitted).

In determining whether federal legislation improperly delegates legislative power to others, the Court applies the "intelligible principle" test. Under that test, "if Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix [administrative rules] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Mistretta v. United States*, 488 U.S. 361, 372 (1989).

As interpreted by CDC, the Public Health Service Act provides no such "intelligible principle" to which CDC "is directed to conform"—and thus unconstitutionally delegates legislative power to the Executive Branch. If CDC's interpretation is correct, then there is *no* action that CDC is not authorized to take in the name of preventing "the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). As interpreted by the Order, § 264(a) would also authorize CDC to prohibit all citizens from attending church services, assembling for the purpose of expressing their political views, or even leaving their own homes. It is debatable whether such measures could pass constitutional muster if adopted by Congress itself; but it is beyond dispute that such measures constitute the sorts of policy decisions that the Constitution reserves to Congress alone in its role as the Nation's exclusive repository of legislative power.

Tellingly, CDC has failed to identify any administrative actions it could *not* take under the Public Health Service Act if, in its judgment, the actions would help to "prevent the introduction, transmission, or spread of communicable diseases." If, as CDC contends, its authority is not circumscribed by the types of actions explicitly mentioned in the next-to-last clause of § 264(a) ("inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of danger or infection to human beings"), then the statute provides no standards by which a court could determine the limits of CDC's power. As the Supreme Court has explained, a statute violates the Article I Vesting Clause if "there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 426 (1944). Under CDC's expansive understanding of the Public Health Service Act, there are no actions that CDC is unauthorized to take (however extreme) once it unilaterally determines that the actions are necessary to curb the spread of communicable

diseases—thereby rendering the Act invalid as an unconstitutional delegation of Congress's exclusive legislative power.

**5.  CDC Has No Authority to Waive, Dispense, or Suspend State Eviction Laws**

Plaintiff is also likely to succeed on its claim that that CDC lacks the authority to waive, dispense, or suspend Ohio's eviction laws. Evictions are a function of Ohio statute. Pursuant to their police power, the several states can and do pass laws governing when and under what circumstances a property owner may evict a tenant and regain possession of his or her property. *Cf. Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242, 247 (1922) (considering the New York legislature's authority to enact emergency housing laws under the state's police power). In Ohio, a comprehensive statutory scheme governs landlord's rights and remedies following a material breach of a rental agreement, including the right to an eviction and the recovery of possession based on nonpayment of rent. See Chapters 1923 and 5321 of the Ohio Revised Code.

CDC's order purports to waive or suspend the duly enacted laws that govern evictions in the State of Ohio. CDC, however, has no authority to waive, dispense, or suspend duly enacted state laws; nor does the Executive Branch more generally. *See Matthews v. Zane's Lessee*, 9 U.S. 92, 98 (1809) (Marshall, C.J.) ("The president cannot dispense with the law, nor suspend its operation."); *see also Baker v. Carr*, 369 U.S. 186, 244 n.2 (1962) ("No tribunal or department in our system of governments ever can be lawfully authorized to dispense with the laws, like some of the tyrannical Stuarts, or to repeal, or abolish, or suspend the whole body of them[.]") (quoting Luther v. Borden, 48 U.S. (1 How.) 1, 69 (1849) (Woodbury, J., dissenting)).

To the contrary, the United States Constitution forbids the Executive Branch from suspending the law. As described by prominent Columbia University Law School Professor Philip Hamburger, the separation of powers enshrined in our Constitution prevents the suspension of law

through executive action, as it would effect a merger of the executive and legislative powers. *See* Philip Hamburger, Nat'l Rev., *Are Health-Care Waivers Unconstitutional?* (Feb. 8, 2011), *available at* https://www.nationalreview.com/2011/02/are-health-care-waiversunconstitutional-philip-hamburger ("The power to dispense with the laws had no place in a constitution that divided the active power of government into executive and legislative powers."). Suspension of laws by the Executive Branch is "a power exercised not through and under the law, but above it." *Id*.

By placing the Suspension Clause in Article I of the United States Constitution, the Founders continued the English common-law tradition of vesting the suspension power in the Legislative Branch. *See* Philip Hamburger, *Beyond Protection*, 109 Colum. L. Rev. 1823, 1919 (2009); Amanda L. Tyler, *Habeas Corpus in Wartime: From the Tower of London to Guantanamo Bay* (2017) (chronicling the original meaning of the Suspension Clause). The limited exception for the suspension of *habeas corpus* "in Cases of Rebellion or Invasion" when "the public Safety may require it" proves the more general rule that duly enacted laws may not be suspended during any other emergency. U.S. Const., art. I, § 9, cl. 2. And in contrast to the legislature's suspension authority, the executive "could not, even during an emergency, seize property" or "constrain the natural liberty of persons who were within the protection of the law, unless [the executive] had legislative authorization." Hamburger, *Beyond Protection*, 109 Colum. L. Rev. at 1919. CDC has not identified any act of Congress that delegated authority to impose eviction moratoriums across the United States. § 264(a) authorizes CDC only to make and enforce regulations that "provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."

CDC has no authority to suspend Ohio's eviction laws absent a specific grant of statutory authority to do so. *See Home Bldg & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1934) ("Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved."). Because CDC has identified no such statutory authority— because none exists—CDC could not lawfully waive, dispense, or suspend the application of Ohio's laws governing a landlord's right to evict a tenant and regain possession of his property. *See* Chapters 1923 and 5321 of the Ohio Revised Code. Plaintiff is therefore substantially likely to prove that CDC's order was unlawful.

### 6.   The Balance of Equities Weighs Heavily in Favor of Plaintiff

A TRO is proper when "the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. "[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated ... ." *Laube v. Haley*, 234 F.Supp. 2d 1227, 1252 (M.D. Ala. 2002); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Republican Party of Minn. v. White*, 416 F.3d 738, 753 (8th Cir. 2005) ("It can hardly be argued that seeking to uphold a constitutional protection ... is not per se a compelling state interest."); League of Women Voters of Fla. v. Browning, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights ... serve[s] the public interest almost by definition.").

The CDC order is unconstitutional and thus the balance of equities weighs heavily in favor of the TRO. Whatever the need for a government response to the COVID-19 pandemic, the order seeks to advance one specific policy solution in violation of the constitutional interests of property holders across the nation. As discussed above, the order presumes that even a single lawful eviction

under state law will result in "mass evictions" and mass homelessness, which in turn will increase the spread of disease to an unacceptable level. Nevermind other aspects of ordinary life that CDC thinks are permissible—mass gatherings, in-person dining, church service, etc. CDC's order is an illogical effort to address the pandemic. Moreover, it is a gross violation of CDC's constitutional limitations. The equities therefore require that the CDC order be temporarily restrained.

### III.    Conclusion

For the reasons stated above, the Court should enter a temporary restraining order and preliminary injunction against the CDC vacating their September 1, 2020 Order suspending lawful residential evictions as applied to Cassandra King. Furthermore, this Court should enter a temporary restraining order and a preliminary injunction pending trial in this matter against Defendant, Franklin County, Ohio Municipal Court c/o Honorable Jarrod B. Skinner, Judge (hereinafter "FCMC") vacating their Order issued on September 14, 2020 staying the eviction against Cassandra King, and require an immediate evidentiary hearing.

In the alternative, Plaintiff respectfully requests this Court to issue an order enjoining all courts in this jurisdiction from staying pending evictions or otherwise delaying evictions unless the veracity of a tenant-defendant's CDC declaration is substantiated by the tenant-defendant and require an immediate evidentiary hearing giving the tenant-defendant the opportunity to do so. Furthermore, Plaintiff requests that this Court issue an order that no federal certification under the CDC's regulation is valid and no Landlord can be held criminally culpable, unless a plaintiff has access to the courts to establish the veracity of the CDC certification during the pendency of an eviction action.

Respectfully submitted,

WILLIS LAW FIRM LLC

/s/ Dimitrios G. Hatzifotinos
William L. Willis (0038537)
Dimitrios G. Hatzifotinos (0077751)
Solomon J. Parini (0096794)
Michael K. Jameson (0096790)
1160 Goodale Boulevard
Grandview Heights, Ohio 43212
mjameson@willislawohio.com
(614) 324-0465
(614) 324-0460 (Fax)
*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2020 I electronically filed the forgoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record, and by US Ordinary Mail.

WILLIS LAW FIRM LLC

/s/ Dimitrios G. Hatzifotinos
William L. Willis (0038537)
Dimitrios G. Hatzifotinos (0077751)
Solomon J. Parini (0096794)
Michael K. Jameson (0096790)